J. & S. OPERATING CORPORATION, Landlord, *v.* SWIRE APPLIANCE Co., INC., Tenant.

City Court of Albany, August 2, 1948.

*Charles J. Duncan* for landlord.

*LaVerne Orvis* for respondent.

HERZOG, J.   This summary proceeding is the first under the recently enacted Albany Business Rent Control Law.   (L. 1948, ch. 679.)   The cause was bitterly fought with accusations made by one side of " rent gouger " and by the other of " unscrupulous tenant."   Motions have been made at various times upon which I have reserved decision and taken proof.   This has been done in order that all the facts might be presented for the purpose of getting a quicker determination upon appeal of the primary issues in this proceeding, which is so vital to the livelihood

of the protagonists. Without reviewing in detail the voluminous testimony and exhibits, I shall set forth the facts that I find so that the background of my holding may be clarified.

This proceeding is to remove the tenant from premises known as No. 29 South Pearl Street, Albany, New York, which are part of a large building containing stores on the first floor and offices of the State of New York on the upper floors. The landlord purchased the building in December, 1946. At that time, this tenant was occupying the premises under a two-year renewal of a lease originally executed September 28, 1944, with the former owner. I should point out that he had actually conducted its business at this location for almost twenty years. The renewal was at a rental of $3,000 per year and expired April 30, 1948. Shortly before the landlord took title, negotiations were conducted between the parties hereto regarding a new lease. The proposition of the landlord was that the tenant should execute a lease for five years, which would take effect immediately, and the old lease cancelled. The rental was to be in the neighborhood of $4,500 to $4,800 per year. The tenant refused to accept these terms and a day or so later the premises were rented to a new tenant, with possession to be given May 1, 1948. The evidence was conflicting as to whether or not the tenant said it would remove April 30, 1948, or whether it was told it must remove on that date. I think it is immaterial, but I find that the tenant was told it would have to remove and also that it said it intended to get out and reiterated that on several occasions. It is an undisputed fact that it did intend to remove and would have done so except for the enactment of the Albany Business Rent Control Law.

After these negotiations failed, the tenant leased a store diagonally across the street from the premises in question at a rental of $7,200 per year. In December, 1947, he moved into this new store and continued to conduct his appliance business there. The greater part of the testimony was devoted to the question of whether or not the tenant actually used 29 South Pearl Street during the first four months of 1948, and up until the commencement of this proceeding as a store, as contemplated by our rent law. I find that these premises were not " predominantly used for the sale of personal property or rendition of services " during that period for the following reasons:

(1) The premises were locked at all times.

(2) The front windows and door were completely covered with signs advertising that Swire had moved to a new location.

(3) They were dirty and trash was allowed to accumulate in the doorway.

(4) Junk was stored in one window and a display in another was never changed.

(5) The telephone was disconnected.

(6) No articles were on display inside, but crates and used appliances were stacked all over. Although occasionally sales, deliveries and repairs were made here, this was not, in my opinion, the predominant use as a store contemplated by the statute.

At the expiration of his lease on April 30, 1948, the tenant held over and shortly thereafter this proceeding was commenced. I might say in passing that it is apparent that after the service of the petition, the tenant cleaned up the store and actually started to conduct his business there, also continuing at No. 14 South Pearl Street. None of the grounds for removal prescribed by section 9 of the Albany Business Rent Control Law (L. 1948, ch. 679) are alleged in the petition. The landlord's contention is that these premises do not come under the protection of that law in that the tenant was not actually using them for a store on the effective date of the law (March 31, 1948) or at the time of the commencement of this proceeding. Although there are many decisions under the Commercial and Business Rent Laws (L. 1945, ch. 3, as amd. and ch. 314 as amd.), no precedent can be found on this point, there being no similar provisions in those acts to the ones in question here.

At first glance there appears to be an inconsistency in the act. This arises because of the provisions of section 16 defining the property entitled to protection and those of subdivision (a) of section 3 defining " Business space " which is the term used throughout the act. I think this apparent inconsistency is reconcilable. Subdivision (a) of section 16 provides that:

" This act shall not apply to (1) any space other than that used or occupied as a store or office  *  *  *."

On the other hand subdivision (a) of section 3 defines " Business space " as: " All space in the city used or occupied *or rented or leased* for use or occupancy as a store or office  *  *  *." (Italics ours.) I have found that on the date of the commencement of this proceeding the premises were not actually used as a " store " as defined in subdivision (b) of section 3. There can be no question but that they were leased for use as a store, for the original lease provided: " To Be Used Only 'for the sale and servicing of appliances." Therefore, these premises are " Business space." Do they fall under the protection of section 16? The rule has been firmly established and repeatedly

reaffirmed that emergency rent laws are not applicable to cases which fall outside the purpose and intent of the statute. (*White-Way Arcade* v. *Broadway Turtle King, Inc.*, 273 App. Div. 281, 285, and cases cited there.)

Lower courts have differed in their interpretation of emergency rent laws. Some hold that they are in derogation of the common law and, therefore, should be strictly construed. (*True-Value Slipper & S. Corp.* v. *Quaker Mech. Corp.*, 189 Misc. 328; *Kristel* v. *Steinberg*, 188 Misc. 500, 517; *Matter of McGrath*, 186 Misc. 27.) The Court of Appeals, in several recent cases, has given courts a more adequate guide to the interpretation of these statutes. In the first place, courts must bear in mind that the basic purpose of the act is: " to protect tenants by placing a ceiling on rents and by preventing widespread evictions while the emergency created by the wartime shortage of space continued." (*Morse & Grossman Inc.* v. *Acker & Co.*, 297 N. Y., 304; see, also, *Twentieth Century Associates, Inc.* v. *Waldman*, 294 N. Y. 571; *Matter of Fifth Madison Corp.* (*N. Y. Tel Co.*), 297 N. Y. 155.) Again, when a case of interpretation somewhat similar to this arose, the court held: " Where the language of a statute is susceptible of two constructions, the courts will adopt that which avoids injustice, hardship, constitutional doubts, or other objectionable results." (*Kauffman & Sons Saddlery Co.* v. *Miller*, 298 N. Y. 38; *Morse & Grossman, Inc.*, v. *Acker & Co.*, 297 N. Y. 304.)

Bearing in mind the above rules of interpretation, I think that these premises definitely fall within the scope of the act. Section 16 uses the words " used or occupied." This language was carefully chosen. There must be a distinction between these two words. Webster's New International Dictionary defines " occupy " as " to hold or keep for use ". See, also, Ballentine's Law Dictionary, 1930. Here the tenant was not actually using the premises as a store but he leased them for that purpose and he held them for use as a store. The only reason he did not so use them was that he was to be evicted within a short time, on the termination of his lease. It is hard to conceive that the Legislature intended to exclude from the protection of the act those persons not actually using the premises as a store at the time, because of the very reasons which gave rise to the act. I think that by defining " used or occupied " in the above manner, the court gives effect to the basic purpose of the act, as expressed by the Court of Appeals. Those premises not included are those not used for a store

or office and those not actually held by a tenant for such use. The Legislature has provided an adequate remedy to landlords when a tenant holds premises for use as a store and does not so use them. Section 9 permits evictions for a violation of a substantial obligation of the tenancy or rental agreement. Use for some other purpose than that for which the premises were rented certainly seems to fall into that category. Thus, this very tenant can be evicted upon compliance with section 9, if he does not use the premises for the sale of appliances. I, therefore, hold that the tenant is entitled to the protection of the act and the landlord having failed to allege any of the reasons for removal authorized by it, cannot succeed in the absence of some other compelling reason.

The landlord has raised two other points. The first of these is that this case comes within the rule enunciated in *White-Way Arcade* v. *Broadway Turtle King, Inc.* (273 App. Div. 281, *supra*) to the effect that when the tenant agrees to a surrender and release of the premises, the rent laws do not apply. I see no merit in this contention. The facts of that case are clearly distinguishable. In the *White-Way Arcade* case (*supra*) the original lease in question was entered into *while the emergency act was in effect*. Eight months after its execution the parties made a written agreement terminating the lease at the specific request of the tenant, who had stated that his business had been unsuccessful. This agreement provided for a surrender and release on January 1, 1947, and the tenant refused to remove at that time. The court very properly, in my opinion, held that none of the emergency conditions which gave rise to the acts, were present, since there was complete freedom of contract between the parties to that action.

That is not the case here. All the reasons for the emergency act are present. These are set forth in *White-Way Arcade* v. *Broadway Turtle King, Inc.* (*supra*, p. 284) and in *Twentieth Century Associates, Inc.,* v. *Waldman* (294 N. Y. 571, 579, *supra*) where the courts quoted with approval the purpose of the Legislature as stated in a report of the joint legislative committee: " These demands are in many cases coupled with an insistence that the tenant sign a lease providing for a substantially longer term than that of the current rental agreement and with a reduction of services previously given. In these cases, the landlord's terms are peremptorily submitted to the tenant in ultimatum form and the latter knows that he must acquiesce or go out of business. As between landlords and tenants in this situation,

freedom of contract has become an illusory concept." No other quotation could fit more closely the facts of this case. At the time the tenant said he would not sign a new lease and would remove, there was no emergency legislation and the conditions existing then gave him little or no choice. True it is he signed a lease at a higher rent for a different store, but when he refused to execute a renewal, he could still hope that he would get a better lease. The proposition of the landlord called for a lease for a longer term, cancellation of his old lease, and an increase of more than 50% in the rent. The peremptory nature of the ultimatum is shown by the landlord's testimony that not more than two days later a new lease was signed at a much higher rental. Therefore, I hold that the *White-Way Arcade* case is not applicable and that there was no surrender and release. I might also add that I am very doubtful if there was any surrender under the facts of this case. No written agreement was executed as in the above case, nor would there have been any consideration for such agreement.

The last point of the landlord is that the tenant is equitably estopped from now claiming the benefit of the act, and on this he cites (*Trustees of Brookhaven* v. *Smith,* 118 N. Y. 634). This contention is based on the fact that the landlord, relying on the statement of the tenant in December, 1946, that he would remove, changed its position by renting the premises to a third party. It also says it relied upon the act of the tenant in renting new premises but it should be noted that this was done long after the landlord had entered into a lease with a new tenant. The difficulty with this contention is that the landlord could not have relied on this statement but rather relied upon his own rights. The tenant said and did no more than the landlord could have compelled him to do under the law at that time. The landlord would not have had to renew the lease on May 1, 1948, under any terms and could have evicted the tenant summarily. Thus, I fail to see how any theory of estoppel can be worked out. It was the change in the law which gave the tenant the right to stay and deprived the landlord of his rights. The Legislature, evidently foreseeing this very situation, enacted section 11, which provides: "No landlord shall be answerable in damages or otherwise for failure to give possession to a new tenant not in possession where the tenant in possession is permitted to hold over by virtue of any of the provisions of this act." There can be no question but that this

section was passed to obviate the very situation which has arisen here, and it does away with any possibility of estoppel. With regard to the various motions made, I grant all motions to amend the pleadings and deny all motions to dismiss the petition, except that made at the conclusion of the petitioner-landlord's case.

Final order granted in favor of tenant, with costs.